IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| CYNTHIA ACREE, individually and as natural parent of J.G., a Minor, and J.G., a Minor,<br><br>        Plaintiffs,<br><br>v.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO. 5:12-CV-51 (MTT)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER

This matter is before the Court on the Defendant's Motion for Judgment as a Matter of Law (Doc. 9) and the Plaintiffs' Motion for Summary Judgment (Doc. 10).  For the following reasons, the Defendant's Motion is **DENIED**, the Plaintiffs' Motion is **GRANTED** in part and **DENIED** in part, and the case is **REMANDED** for reconsideration of the Plaintiffs' claim.

### I.   FACTUAL BACKGROUND

On October 11, 2009, Edwin Gwinette died as a result of a single gunshot wound to the chest.  (Doc. 9-5 at 61).  Gwinette was a participant in an employee welfare benefit plan sponsored and maintained by his former employer, Xerium Technologies, Inc. ("Xerium"), and funded by group insurance policies issued to Xerium by Defendant Hartford Life and Accident Insurance Company ("Hartford").  (Doc. 15-1 at 2).  Gwinette's policies named two beneficiaries, Plaintiffs Cynthia Acree, his ex-wife, and J.G., his minor daughter.  Although Hartford paid the Plaintiffs $261,562.52 in basic and

supplemental life insurance plus interest, Hartford determined that Gwinette's death was a suicide and denied accidental death and dismemberment ("AD&D") benefits.

### A.      The Relevant Plan Provisions

This case involves two life insurance policies issued by Hartford.  Both policies pay AD&D benefits when an injury is sustained that results in a defined loss, including the loss of life, within 365 days of the date of accident.  (Doc. 9-3 at 51, 78).  "Injury" is defined as "bodily injury resulting: 1) directly from an accident; and 2) independently of all other causes."  (Doc. 9-3 at 60, 86).  Both policies also contain exclusions for losses caused or contributed to by "intentionally self-inflicted injury" and "suicide or attempted suicide, whether sane or insane."  (Doc. 9-3 at 56, 82).

### B.      Hartford's Initial Investigation and Claim Denial

On October 16, 2009, Acree filled out a Claimant's Statement of Accidental Death or Injury form and sent it to Xerium for forwarding to Hartford.  On the form, she stated that the gunshot wound to the chest occurred while Gwinette was cleaning a gun "that was assumed to be unloaded," but the gun jammed with a round in the chamber. (Doc. 9-5 at 56).  Hartford assigned the claims to claim analyst, Erica J. Doiron.  (Doc. 9-5 at 32).  Doiron denied the Plaintiffs' claims for AD&D benefits, relying, in addition to the policy language, on three reports: the Death Certificate, the Medical Examiner's Report from the Georgia Bureau of Investigation ("Autopsy Report"), and an Incident Report from the Upson County Sheriff's Office ("Incident Report").  (Doc. 9-5 at 27). Doiron first received the Death Certificate, which was issued on December 23, 2009. (Doc. 9-5 at 61, 83).  In the Death Certificate, the Coroner, Michael Timothy Cochran, listed the cause of death as trauma arrest resulting from a self-inflicted gunshot wound

to the chest.  (Doc. 9-5 at 61).  However, after reviewing the Autopsy Report, the coroner ultimately concluded that the manner of death was undetermined, rather than suicide.  (Doc. 9-5 at 61).

On March 10, 2010, Doiron received the Autopsy Report, which was completed on October 27, 2009, and listed the manner of death as "suicide (shot self)."  (Doc. 9-5 at 40, 90).  In that report, the Assistant Medical Examiner ("AME") concluded that Gwinette "died of a self inflicted contact range gunshot wound of the chest which perforated the heart and major vessels.  Autopsy failed to reveal any other trauma thus the manner of death is suicide."  (Doc. 9-5 at 43).  The AME noted that there was "blood on the left hand as well as the abdomen" with the direction of the bullet being front to back.  (Doc. 9-5 at 41).  The AME also stated that he reviewed scene photographs and listed the investigating officer as R. Cochran.  (Doc. 9-5 at 39, 43).

Also on March 10, Doiron recorded in the claim file that the "claim will be denied" and the "manner of death was ruled a suicide; there is no indication of accident."  (Doc. 9-5 at 90).  Presumably, this conclusion was based on the Autopsy Report because Doiron had no other information stating the conclusion that Gwinette had committed suicide.

On March 18, Doiron received the Incident Report completed by Deputy Timothy Salter, the officer who first responded to the scene.  (Doc. 9-5 at 90; Doc. 9-6 at 42). This apparently was in response to a request Doiron had made to the Upson County Sheriff's Department on January 29.  However, on February 2, Acree had asked Doiron to request a report from Investigator Ronnie Cochran, who was the "R. Cochran" identified in the Autopsy Report as the investigating officer.  Acree also asked Doiron to

call her when she received the report.  (Doc. 9-5 at 91).  Doiron requested Cochran's

report, but apparently never received a response and she never called Acree back.

In his Incident Report, first responder Salter listed the "incident type" as suicide

and stated in his supplemented narrative the following:

> On October 11, 2009 at 12:58 hours I, Deputy Tim Salter, responded . . .
> in reference to a Suicide.  Upon arrival EMS was already on the scene.
> EMT Martha Ann McCarty told me as I walked in the yard that there was a
> male subject on the back porch deceased from an apparent gun shot
> wound.  I went to the back porch and saw a white male sitting in a chair
> slumped over to his left side.  I saw a chrome plated hand gun on the deck
> floor near his left hand.  I saw a small amount of blood on his clothes and
> saw a hole, along with blood, in the center chest area of his shirt.  I
> notified Sgt. Barfield, Capt. McLaughlin and Major Kilgore of my situation.
> I then contacted the on-call Investigator, Lt. Cochran.  I was told by the
> neighbors that the victim had a daughter, so I entered the back door to
> secure the residence.  Nothing was found on the inside of the residence.  I
> found a pay stub and the victim's identification.  The victim is Edwin David
> Gwinette.  I talked to the neighbors that found him, Michael Lamb and
> Lorenzo Delacruz.  [L]amb said that he started cutting grass and notice[d]
> the victim on the porch.  Lamb said he thought he may be intoxicated by
> the way he was sitting.  [L]amb said he cut a few more passes and never
> saw the victim move.  Lamb said he went to Delacruz's house across the
> street.  Delacruz said that as he approached the victim, he saw the gun
> and immediately stopped and called 911.  Lamb said he heard a gun shot
> before 12:00 PM, but was not sure of the time.  Lamb said he has heard
> people shooting in the area before so he did not think much about the
> shot.  I was able to find Gwinette's ex-wife, Cynthia Acree's, phone
> number and contacted her.  She gave me his mother, Doris Gwinette's,
> phone number and I contacted her also.  Gwinette was pronounced dead
> at 13:17 hours by Tim Cochran, the Coroner and the incident was turned
> over to Investigator Cochran[.]

(Doc. 9-6 at 43).

On March 26, Doiron amended the Claims Worksheet to note that the "claimant

did not suffer accidental injury because the injuries were self-inflicted review of reports

state manner is suicide" and forwarded the claim for next level review.  (Doc. 9-5 at 33).

Examiner Debra Favreau agreed with the recommendation, and Doiron sent a letter on

April 6 denying the Plaintiffs' claims for AD&D benefits.  (Doc. 9-5 at 89-90).  The April 6

letter explained that Gwinette's "death was caused by or contributed to by a specific

exclusion for coverage," citing both exclusions for intentionally self-inflicted injury and

suicide.  (Doc. 9-5 at 26-27).  The letter also summarized the findings in the Death

Certificate, the Autopsy Report, and the Incident Report and concluded that the gunshot

wound to Gwinette's chest was intentionally self-inflicted.  (Doc. 9-5 at 27).  The letter

advised the Plaintiffs of their right to appeal:

> If you have additional information, not previously submitted, which you
> believe will assist us in evaluating your claim for Accidental Death
> benefits, please forward that to us for our consideration within sixty (60)
> days from the date of your receipt of this letter.  In particular, any
> information which indicates that the insured's death was not caused or
> contributed to by any intentionally self-inflicted injury, may assist us in
> further evaluating your claim for benefits.  Hartford will review any
> additional information you submit, along with the previously submitted
> information and notify you of the results of our review.

(Doc. 9-5 at 27).  Noting that the Xerium plan was "governed by ERISA and federal

common law," Doiron further advised the Plaintiffs of their right to bring a civil action

under ERISA should Hartford deny their claim upon appeal.  (Doc. 9-5 at 26, 28).

### C.    Hartford's Denial of the Appeal

The Plaintiffs, through counsel, submitted their appeal to Hartford on May 18,

2010.  (Doc. 9-5 at 11-16).  The Plaintiffs submitted the following additional information:

(1) interviews with Acree, Gwinette's daughter, his best friend, and a co-worker

indicated that "Gwinette was not despondent, depressed or suicidal"; (2) the interviews

indicated that there had been no change in Gwinette's "upbeat personality"; (3)

"Gwinette was very much in love with his daughter … and took his parenting duties

seriously"; (4) Gwinette had just purchased a home in January 2009, and he purchased

groceries and gas and paid his phone bill within twenty-four hours of his death; (5)

Gwinette was a devout Catholic who attended mass the morning of his death; (6)

Gwinette was unfamiliar with guns and still learning about safety and shooting; (7) the

gun that caused his death "would jam repeatedly after firing the first round"; and (8)

Investigator Ronnie Cochran stated that "Gwinette was found in a chair on his back

porch with gun cleaning materials beside the chair" and the gun did not have a clip in it.

(Doc. 9-5 at 11-12).  The Plaintiffs also enclosed copies of the last two pages of

Gwinette's check book to verify his recent purchases and a copy of the memorial

bulletin from Gwinette's funeral service.  (Doc. 9-5 at 13-16).

Hartford assigned the appeal to Appeals Specialist Giuseppina Gulino.  (Doc. 9-5

at 5, 7).  Gulino conducted an initial review of the appeal file on June 2 and made a final

determination on June 4 that the claim denial would be upheld.  (Doc. 9-5 at 5-6).

Gulino's initial internal assessment stated that the "claim was denied on the basis that

[Gwinette's] death was undetermined" and that the appeal letter submitted by the

Plaintiffs' counsel essentially "confirmed that [his] death was undetermined."  (Doc. 9-5

at 6).  Her final internal assessment concluded:

> We have the death certificate which indicates [Gwinette's] death was
> undetermined, and the Incident Report indicates it was due to suicide.
> Both causes are not covered by the policy as they do not support that [his]
> death resulted directly from accident and independently of all other
> causes, therefore, this denial was appropriate and it stands.

(Doc. 9-5 at 6).

Gulino then sent a letter to the Plaintiffs' counsel denying the appeal and stating

that Gwinette's death was a result of suicide and therefore excluded from coverage.

(Doc. 9-5 at 1).  The letter from Gulino recapped the information provided in the

Plaintiffs' appeal letter but stated that "[Hartford] must rely upon the facts brought forth by the experts, the documentation they submitted, and the policy provisions and guidelines." (Doc. 9-5 at 3). The denial letter concluded that even an "undetermined" death would still be excluded from coverage because the loss "must have resulted directly from accident and independently of all other causes." (Doc. 9-5 at 3-4). Gulino did not conduct any additional investigation before denying the appeal, believing that "[t]he documentation in the claim file was sufficient for [her] to make a thorough and sound claim decision." (Doc. 34-1 at ¶ 10). Gulino did not request any additional information or documentation from the Plaintiffs before making the decision to deny the appeal.

## II.  DISCUSSION

### A.    Motion for Judgment as a Matter of Law Standard

When a decision is based on an agreed-upon administrative record, judicial economy favors using findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52 rather than summary judgment under Fed. R. Civ. P. 56. *Adams v. Hartford Life & Accident Ins. Co.*, 694 F. Supp. 2d 1342, 1345 n.1 (M.D. Ga. 2010) (citing *Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1363 n.5 (11th Cir. 2008)). Both Parties have stipulated to the administrative record.[1] Therefore, the Court treats these motions as a trial on the record pursuant to Rule 52(a). "In an action tried on the facts without a jury … the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of

---

[1] Because the administrative record has been electronically filed at Documents 9-3 through 9-6, this Order cites to the record by using the document number and electronic screen page shown at the top of each page by the Court's CM/ECF software rather than the administrative record cites.

the evidence or may appear in an opinion or a memorandum of decision filed by the court."  Fed. R. Civ. P. 52(a)(1).

### B.    ERISA Analytical Framework

Because the Plaintiffs are seeking benefits pursuant to an employee benefit plan, this matter is governed by The Employee Retirement Income Security Act of 1974 ("ERISA").  ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court."  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (citing 29 U.S.C. § 1132(a)(1)(B)).  ERISA itself does not provide a standard for courts reviewing benefits decisions made by plan administrators or fiduciaries.  *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989)).  Based on guidance from the Supreme Court in *Glenn* and *Firestone*, the Eleventh Circuit "established a multi-step framework to guide courts in reviewing an ERISA plan administrator's benefits decisions."  *Id.*  The steps are:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355 (internal citation omitted).

The Parties have raised some issues, however, where the appropriate standard of review is not clear.  Specifically, the Plaintiffs have pointed to several flaws in Hartford's procedural compliance with ERISA statutes and regulations.  The Court has not found, and the Parties have not pointed to, any clear Eleventh Circuit authority addressing the standard of review for procedural compliance.  The Sixth Circuit has stated that "the question of whether the procedure employed by the fiduciary in denying the claim meets the requirements of [29 U.S.C. § 1133] is a legal question which the [c]ourt must address *de novo*" even when the plan grants the administrator discretion. *Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 806 (6th Cir. 1996) (internal citation omitted).  A *de novo* review seems to be the most appropriate standard to use for procedural compliance issues.  A plan administrator should not be given deference when deciding whether to comply with the law Congress established to protect beneficiaries and govern the administration of employee benefit plans.

Courts in this circuit have treated analysis of procedural violations separately from analysis of the merits of an administrator's decision under the ERISA framework. *See, e.g.*, *Melech v. Life Ins. Co. of N. Am.*, 2012 WL 4210506 (S.D. Ala.); *Ecklund v. Cont'l Cas. Co.*, 415 F. Supp. 2d 1353 (N.D. Ala. 2005).  While there is no clear guidance on the issue, *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189 (11th Cir. 2010), seems to suggest that an error in the procedure required under ERISA should be

reviewed *de novo*. *Capone* held that the denial of benefits without a proper investigation pursuant to 29 U.S.C. § 1104(a)(1) was *de novo* wrong. *Id.* at 1199-1200. Because of the lack of clarity on this issue, however, the Court will address the Plaintiffs' allegations of improper procedure after its analysis under the *Blankenship* framework.

### C.   Burden of Proof

A claimant suing under ERISA has the burden of proving entitlement to plan benefits. *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (internal citation omitted).  However, "if the insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage." *Id.* (internal citation omitted).  Although Hartford argues that Gwinette's death falls under two exclusions to the policy, the Plaintiffs must still prove that the death was accidental in order to receive AD&D benefits.  Because the Parties have not argued otherwise, this Court will assume, as the Eleventh Circuit did in *Horton*, that the burden of proof remains on the Plaintiffs.

### D.   Whether Hartford's Denial of AD&D Benefits Was *De Novo* Wrong

The first step of the *Blankenship* framework requires the Court to determine whether Hartford's denial of the AD&D benefits was "wrong"; that is, the Court must decide whether it agrees with the plan administrator's decision.  *Blankenship*, 644 F.3d at 1355.  In making this determination, the Court does not give any deference to Hartford's decision and, instead, "stand[s] in the shoes of the administrator and start[s] from scratch, examining all the evidence before the administrator as if the issue had not

been decided previously." *Bates v. Metro. Life Ins. Co.*, 2009 WL 2355834, at *10 (M.D. Ga.) (internal quotations and citation omitted).

The Court must limit its review of the evidence to the same record that was before the plan administrator at the time the denial of benefits was made. *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1247 (11th Cir. 2008) (citing *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989)).  It bears mentioning that by limiting its review to the administrative record, the Court operates under the burden of a fiction.  Despite the several references in the administrative record to photographs of the scene, those photographs are not in the administrative record.  The Plaintiffs did not timely submit them and Hartford, notwithstanding its knowledge of the pictures, did not request them from either the Plaintiffs or the authorities.  Only after filing suit, did the Plaintiffs submit the photographs to Hartford. These photographs depict gun cleaning materials and supplies next to Gwinette's body.[2]

The Plaintiffs argue that Hartford's decision was wrong because the evidence in the record is, from Hartford's standpoint, inconclusive at best as to the cause of Gwinette's death.  The Plaintiffs contend that federal common law presumptions against suicide and in favor of accidental death exist to resolve inconclusive cases, and Hartford failed to apply these presumptions here before denying benefits.  Hartford, however,

---

[2] In the Court's experience, lawyers for ERISA claimants all too often do not appreciate the importance of getting all their evidence in the administrative record.  Thus, it is not uncommon for ERISA claimants, when they get to court, to discover they cannot use what they think is critical evidence.  What is unusual here is Hartford's strident insistence that there is no corroboration of the Plaintiffs' story that Gwinette was cleaning his gun when the "official" photographs demonstrate that Gwinette was cleaning his gun.

argues that the evidence before it was not "vague or inconsistent" at all.  (Doc. 9-1 at 21 n.5).  In fact, Hartford contends, it relied on conclusive reports "developed through independent investigations by government agencies," while the Plaintiffs never submitted evidence to support their uncorroborated and "improbable" theory that Gwinette accidentally shot himself while cleaning his gun.  (Doc. 9-1 at 21-22).  Even though a federal common law presumption against suicide exists to resolve inconclusive cases, Hartford argues that the Plaintiffs' "argument is misguided because it presupposes that the evidence in this case was 'inconclusive' simply because [the Plaintiffs disagree] with the AME's conclusion."  (Doc. 15 at 5).

"Courts have the authority 'to develop a body of federal common law to govern issues in ERISA actions not covered by the act itself.'"  *Horton*, 141 F.3d at 1041.  To further ERISA's "two central goals [of] protection of the interests of employees and their beneficiaries in employee benefit plans [and] uniformity in the administration of employee benefits plans", the Eleventh Circuit firmly established the negative presumption against suicide and the affirmative presumption of accidental death as a part of the federal common law.  *Id.*  "The presumptions never drop out of the case until the factfinder [i.e., the Court] becomes convinced, given all the evidence, that it is more likely than not that [the insured] committed suicide."[3]  *Id.* at 1042.  If the Court finds that

---

[3] Hartford asserts that the presence of a suicide exclusion in the policy "does not negate [the Plaintiffs'] burden to establish that the death was an accident in order to be entitled to benefits, and they should not be permitted to do so by presumption."  (Doc. 19 at 6 n.3).  Hartford cites Couch on Insurance, arguing that the presumption against suicide should not be used as a tiebreaker in an accidental death case.  *See* COUCH ON INSURANCE § 138.66 (3d ed. 2012) ("[A]llowing the presumption to serve as any sort of 'tie-breaker' in favor of accident over suicide in the context of an accidental death policy would effectively create coverage by presumption, and reverse the ordinary burdens of proof, contrary to the principles of insurance law.").  Couch goes on to point out, however, "there is contrary authority indicating that the presumptions

Hartford's evidence of suicide is "not so strong that every reasonable fact-finder would have had to find the death to be a suicide," then the Court may find that the death was accidental and that Hartford is *de novo* wrong.  *Id.*

Hartford based its decision to deny the Plaintiffs' claim on what it calls the "official" reports: the Autopsy Report, the Incident Report, and the Death Certificate. Hartford argues that the Autopsy Report and Incident Report conclusively demonstrate that the cause of death was suicide, and the "single word 'undetermined' in a death certificate which also describes the injury as a self-inflicted gunshot wound is insufficient to cast doubt" on the conclusion that Gwinette committed suicide.  (Doc. 9-1 at 22).  The Court disagrees with Hartford's conclusions regarding each of these reports.

With regard to the Death Certificate, Hartford understates the significance of the Coroner's findings contained in the Death Certificate.  Coroner Cochran was present at the scene along with law enforcement investigators and thus had an opportunity to observe firsthand the circumstances of Gwinette's death.  Coroner Cochran reviewed the Autopsy Report as a part of his investigation.  (Doc. 9-5 at 61).[4]  In response to the question whether Gwinette's death was an accident, suicide, homicide or undetermined, Coroner Cochran stated "undetermined."  (Doc. 9-5 at 61).

---

against suicide in the case of a straight life policy and in the case of an accidental death policy are to be treated the same."  *Id.*  The Eleventh Circuit considered this issue in *Horton* and clearly established, in the context of an accidental death policy, not only that a negative presumption against suicide existed under the federal common law governing ERISA but that an affirmative presumption of accidental death was to be used in the face of inconclusive evidence, effectively allowing the presumptions to serve as tiebreakers.  *Id.* at 1041.

[4] Specifically, after confirming that an autopsy was done, Coroner Cochran answered yes to this question: "If yes, were findings considered in determining cause of death?  Yes."  (Doc. 9-5 at 61).

With regard to the Autopsy Report, the AME focused only on the presence of a self-inflicted and contact range gunshot wound coupled with the absence of other trauma: "Autopsy failed to reveal any other trauma thus the manner of death is suicide." (Doc. 9-5 at 43).  Other than this, the Autopsy Report provides no explanation or analysis explaining how the AME arrived at the conclusion "suicide (shot self)."  He did not examine the firearm and although his report references some pictures, there is no indication that the AME was aware of the evidence that Gwinette was cleaning his gun. Nor is there any indication that the AME had any information about Gwinette's state of mind.  Although the AME clearly concluded in the Autopsy Report that the manner of death was suicide, the conclusory statement "suicide (shot self)" without further explanation or evidence does not "conclusively" support a conclusion of suicide.  (Doc. 9-5 at 40).  Certainly, when the Autopsy Report and the Death Certificate are considered together, it cannot be said "conclusively" that Gwinette committed suicide.

Further, despite Hartford's strong argument to the contrary, the Incident Report does not "conclusively" establish that the cause of death was suicide.  In his Incident Report, Deputy Salter only said he "responded … in reference to a [s]uicide"; information apparently provided by Gwinette's neighbor who called 911 after discovering the body.  (Doc. 9-6 at 43).  Deputy Salter, however, never made any conclusions as to the cause of death, which is not surprising given that he was the first responder, not the investigating officer.  He merely noted the position of the body, the location of the gunshot wound, and the placement of the gun.  Deputy Salter's brief narrative concluded with the results of his interviews with two of Gwinette's neighbors who arrived at the scene sometime after the event, which yielded no information other

than that one of them heard a gunshot at some point before they discovered the body. The incident was then turned over to Lieutenant Ronnie Cochran for the actual investigation.[5]

In sum, the "official" reports, as Hartford calls them, demonstrate there was insufficient evidence to conclusively establish that the cause of death was suicide.

Other information in the record, indeed almost all other information in the record, suggested that Gwinette's death was accidental.[6]  As Hartford freely admits, its claim analysts essentially ignored this information because, as Hartford now says, it was "not corroborated by the physical evidence contained in the ['official'] reports."  (Doc. 34 at 16).  However, much of this information suggests the absence of a motive or intent to commit suicide, which, as we shall see,[7] is supposed to carry significant weight in Hartford's review.  Gwinette's family and close friends stated that Gwinette had not experienced any personality changes and that he had not been depressed.  He also had a very strong relationship with his daughter.  Gwinette had purchased a new home less than a year before his death and had purchased necessities and paid bills shortly before his death.  As a devout Catholic, Gwinette also attended mass on the morning of

---

[5] Hartford points out that the Incident Report "was never revised or supplemented with Mr. Cochran's purported observations."  (Doc. 19 at 9).  However, there is no indication from the administrative record that Lieutenant Cochran made an additional report, only that Hartford sent one request to Lieutenant Cochran but apparently never heard back from him.  (Doc. 9-5 at 91-92).

[6] Although Hartford did not give any weight to the information submitted by the Plaintiffs, the Court does not have to defer to Hartford's decision during its *de novo* analysis on how to weigh the evidence.  Accordingly, the Court does not distinguish between information found in "official" reports submitted by experts and the information submitted by the Plaintiffs during this portion of the ERISA framework analysis.

[7] *See infra* section II.F.1.

his death.  There is no evidence in the record to suggest that Gwinette had any physical or mental health issues, financial problems, or domestic situations that would provide a motive to commit suicide.  Furthermore, no suicide note was found or believed to exist.

Also, the Plaintiffs stated in both the claim form for AD&D benefits and in their appeal letter important facts concerning the condition of the gun and the reason for its use at the time of death.  This too, is information that Hartford, according to its Investigation Guidelines, considers very important in the resolution of gunshot deaths.[8] The initial claim form stated that Gwinette was cleaning the gun, which he assumed to be unloaded, when it jammed with a round in the chamber.  (Doc. 9-5 at 56).  A friend of Gwinette's stated that he was unfamiliar with guns and that the used gun he purchased "would jam repeatedly after firing the first round."  (Doc. 9-5 at 12).  Lieutenant Cochran stated that gun cleaning materials were beside the chair Gwinette was found in, and the gun did not have a clip in it.  (Doc. 9-5 at 12).

The facts presented by the Plaintiffs considered alongside the "official" reports are sufficient to show that the evidence regarding Gwinette's cause of death was at least inconclusive, if not more likely to support a conclusion that Gwinette's death was accidental.  Accordingly, the Court will apply the federal common law presumptions against suicide and in favor of accident at this stage in the analysis and finds that Gwinette's death was accidental.

Hartford argues that "the Plaintiffs' reliance on a legal presumption" ignores the fact that Hartford denied benefits based on two exclusions to the policy, and the exclusion for losses "caused or contributed to by … intentionally self-inflicted injury" is

---

[8] *See infra* section II.F.1.

not subject to the presumption.  (Doc. 15 at 6).  Hartford contends that even if Gwinette

did not intend to die or injure himself, he still intended to shoot himself in the chest and

such a loss would be excluded under the policy because "the natural and probable

consequence of shooting yourself in the chest is serious injury or death."[9]  (Doc. 15 at

12).  Hartford continues to justify its position by stating that the Plaintiffs "have not

presented any evidence to support their theory that Mr. Gwinette did not intend to shoot

himself."  (Doc. 15 at 12).

      The Court finds that Hartford's argument is specious and beside the point.

Although Hartford discounts to nil the information submitted by the Plaintiffs as

unreliable and uncorroborated, the *only* indicia of Gwinette's intent in the record is the

information submitted by the Plaintiffs.  There is no evidence in the record that Gwinette

had the subjective intent or a motive to shoot himself, nor is there any physical evidence

to show whether Gwinette purposefully pulled the trigger or whether the gun discharged

accidentally.  To determine whether the intentionally self-inflicted injury exclusion

applies, the issue here is not whether to resolve the question of Gwinette's intent to die

by subjective or objective reasoning, but whether Gwinette ever intentionally pulled the

trigger in the first place.  The record demonstrates to the Court that Gwinette made no

more than a "fatal mistake," and a fatal mistake is not an intentionally self-inflicted injury.

*See Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1130 (9th Cir. 2002) (noting that

---

[9] Hartford cites *Wickman v. Nw. Nat'l Ins. Co.*, 908 F.2d 1077 (1st Cir. 1990) to support its argument.  The Court addresses later why *Wickman* is not applicable to this case and why reliance on the standard announced in *Wickman* would render Hartford's decision arbitrary and capricious.

accident insurance is purchased "for the very purpose of obtaining protection from [one's] own miscalculations and misjudgments").[10]

Accordingly, the Court finds that Hartford's decision to deny benefits under either the suicide or intentionally self-inflicted injury exclusion is *de novo* wrong.

### E.    Whether Hartford's Denial of AD&D Benefits Was Arbitrary and Capricious

The second step in the *Blankenship* framework asks whether the plan administrator had the discretion to review claims.  The Parties agree that the plan language vested Hartford with such discretion.  Both policies state that Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy."  (Doc. 9-3 at 58, 84).  Because Hartford had discretion, the Court must proceed to the third step in the framework which requires the Court to determine whether Hartford's decision, even if *de novo* wrong, was based on "reasonable" grounds under the deferential arbitrary and capricious standard. *Blankenship*, 644 F.3d at 1355.

"'As long as a reasonable basis appears for [the plan administrator's] decision …, it must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision.'"  *White v. Coca-Cola Co.*, 542 F.3d 848, 856 (11th Cir. 2008) (quoting *Jett*, 890 F.2d at 1140).  "A decision is arbitrary and capricious if it was made in bad faith, not supported by substantial evidence, or is erroneous on a question of law."  *Schreck v. Reliance Standard Life Ins.*, 104 F. Supp. 2d 1373, 1376

---

[10] Moreover, the presumption recognized by the Eleventh Circuit in *Horton* operates against suicide and in favor of accidental death.  It seems obvious that a presumption in favor of accidental death would operate to negate intentionally self-inflicted injury just as it would negate suicide.

(S.D. Fla. 2000).  The Court's review of Hartford's decision at this stage of the analysis is also limited to the administrative record.  *See Glazer*, 542 F.3d at 1246.

The Plaintiffs argue that Hartford's decision to deny AD&D benefits was arbitrary and capricious for several reasons.  First, the Plaintiffs contend that Hartford abused its discretion when it refused to apply the federal common law presumptions against suicide and in favor of accident.  Second, the Plaintiffs contend that Hartford's decision was unreasonable because it was not supported by substantial evidence.  Finally, the Plaintiffs insist that Hartford's denial should be overturned because it acted with an improper motive under a conflict of interest, resulting in a bad faith review.

In response, Hartford asserts that federal courts rather than plan administrators are required to apply federal common law presumptions, and even if Hartford did have a duty to apply the presumption against suicide, this presumption would have had no bearing on the outcome of its decision because the evidence was not inconclusive. Hartford argues that its decision is not arbitrary and capricious because it "resulted from a deliberate, principled reasoning process and is supported by substantial evidence in the administrative record."  (Doc. 9-1 at 22) (quoting *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006)).  While acknowledging that a structural conflict of interest existed, Hartford denies that it had any bearing on its decision making process and, instead, asserts that safeguards exist to prevent biased decisions.

### 1.    Failure to Apply the Correct Federal Common Law

In its *de novo* analysis of the case, the Court found that the federal common law presumptions against suicide and in favor of accidental death apply here, rendering Gwinette's death accidental.  While the law is clear that a court must follow the federal

common law, there is no clear Eleventh Circuit authority addressing whether the administrator is also bound to apply legal presumptions developed under the federal common law.[11]  Hartford contends that while a court may use legal presumptions under a *de novo* review, these presumptions do not affect a court's review under its arbitrary and capricious analysis because legal presumptions are not part of the administrative process.  Because courts are charged with the responsibility to develop the federal common law, Hartford assumes it logically follows that plan administrators do not have the responsibility to use the legal presumptions that courts craft when reviewing claims.  Hartford also points out that its "claims personnel are not lawyers or judges with the legal skill and training to apply legal presumptions."  (Doc. 19 at 7).

Hartford cites two cases to support its argument that the legal presumption is only to be used to determine if its decision was "wrong" under *de novo* review and not under the arbitrary and capricious standard.  Neither case, however, addresses the issue before the Court.  In *Malin v. Metropolitan Life Insurance Co.*, 845 F. Supp. 2d 606 (D. Del. 2012), the court held that even if it were to recognize the legal presumption against suicide, which had not been firmly established in the Third Circuit as it has been in the Eleventh Circuit, the presumption would not change the outcome under arbitrary and capricious review because the evidence of the insured's intent to commit suicide was "sufficient to persuade the factfinder," and "the presumption against suicide does

---

[11] *Horton* analyzed only whether it was error for the district court to use legal presumptions to decide the case and not whether the administrator should have applied the presumption in reaching its decision because the district court only conducted a *de novo* review.  141 F.3d at 1041-42.  While *Horton* states that "[t]he presumptions provide *courts and juries* with uniform rules to resolve coverage questions where the evidence of how the insured died is inconclusive," it never precludes their use or even suggests that they should not be used by administrators because that issue was never before the court.  *Id.* at 1041 (emphasis added).

not override such evidence." *Id.* at 614-15.  The record in *Malin* revealed that the insured retrieved a gun after an intense argument with his wife, removed some bullets from the gun, and then pointed the gun at his head and pulled the trigger while his wife begged him to stop.  *Id.* at 608.  The gun discharged when the insured pulled the trigger a second time.  *Id.*  The court did not express an opinion on the effect the presumption would play under an arbitrary and capricious review if the evidence in the record was inconclusive.

In *Weaver v. UNUM Life Insurance Co. of America*, 2012 WL 1642189 (N.D. Ala.), the district court operating under the Eleventh Circuit's ERISA framework first determined whether the plan administrator's decision was "wrong."  *Id.* at *5.  Finding that the administrative record contained "sufficient evidence to support a finding that suicide was more likely than a tragic accident," the court determined that the administrator's decision was correct and ended its analysis.  *Id.* at *6.  The court never reached the issue of what role the legal presumption plays in the arbitrary and capricious review because the court found that the presumption against suicide dropped out during *de novo* review.  *Id.*

The Plaintiffs argue that adopting Hartford's position that legal presumptions are only for use by courts and not plan administrators would render the presumption meaningless whenever an administrator is granted discretion.  Further, the Plaintiffs assert that "[t]he common law presumption against suicide is the law and Hartford must follow the law" and failure to follow the law must be held to be arbitrary and capricious because any decision made without consideration of the applicable law would be "inherently flawed."  (Doc. 20 at 8-9).

While the Eleventh Circuit has not yet reached the issue of whether a plan administrator has a duty to employ legal presumptions in their claims review process and whether the failure to do so is arbitrary and capricious, the Ninth Circuit addressed this precise issue in *Schikore v. BankAmerica Supplemental Retirement Plan*, 269 F.3d 956 (9th Cir. 2001).  The court in *Schikore* dealt with the application of the federal common law mailbox rule to a claim denial under an ERISA plan.  *Id.* at 958.  The court stated that "an error of law constitutes an abuse of discretion," and "[t]he abuse of discretion rule is equally applicable in the case of errors of law made by plan administrators."  *Id.* at 960-61 (internal citations omitted).  Noting that the mailbox rule is a "settled feature of the federal common law" and a rebuttable presumption to be used "in the face of inconclusive evidence," the Ninth Circuit found under its arbitrary and capricious analysis that the administrator abused its discretion for failing to apply the common law presumption.  *Id.* at 961.

The Court agrees with the conclusion in *Schikore*.  The legal presumptions against suicide and in favor of accidental death are "settled feature[s] of the federal common law" in this circuit, and plan administrators are bound to apply the law during the administrative process.[12]  Even Hartford's own correspondence to the Plaintiffs

---

[12] Hartford contends that requiring plan administrators to apply a legal presumption at the administrative level "would undermine Congress's purpose of providing uniform administration of plans by requiring disparate treatment of similarly situated participants in different states." (Doc. 19 at 7 n.4).  Hartford's argument lacks merit.  While one of the central goals underlying ERISA is the uniform administration of employee benefit plans, there will be inherent variation in the administration of plans from state to state because plan administrators can include choice of law provisions in their plans to incorporate state law that does not conflict with ERISA.  *See Buce v. Allianz Life Ins. Co.*, 247 F.3d 1133, 1149 (11th Cir. 2001) (stating that choice of law provisions in ERISA contracts should be followed as long as they are "not unreasonable or fundamentally unfair").

acknowledges that its policies are subject to the federal common law.  (Doc. 9-5 at 26).

As a practical matter, it would be unworkable to apply the common law presumption

against suicide only after a claim is filed in court.  It is likely that a court applying the

presumption would almost always reach a different result than an administrator who did

not.

Hartford attempts to distinguish *Schikore* by pointing out that the claimant there

argued in her appeal to the plan administrator that the mailbox rule applied, and the

administrator incorrectly determined that ERISA preempted the common law mailbox

rule.  *Id.* at 960-61.  Here, Hartford argues, it never had the opportunity to consider

whether the legal presumption should apply to the Plaintiffs' claim because the Plaintiffs

never mentioned the presumption at the administrative level.[13]  (Doc. 34 at 21).  The

Court finds Hartford's argument unavailing.  The arbitrary and capricious standard of

review encompasses an administrator's factual as well as legal interpretations

underlying its decision.  *See Paramore v. Delta Air Lines*, 129 F.3d 1446, 1450 (11th

Cir. 1997) ("[W]e consistently have applied the arbitrary and capricious standard to

eligibility determinations-without necessarily distinguishing the factual from the legal,

interpretive bases of those decisions ….).  The Court cannot find any conceivable

difference between an administrator's application of the incorrect law and an

administrator's failure to apply the correct law for purposes of an arbitrary and

---

[13] It is Hartford's practice for its appeals specialist to consult with Hartford's legal department
when he or she receives a claimant's appeal letter that "relies on a statute or case law to make
legal arguments" to determine how those legal arguments impact the review.  (Doc. 34 at 21).
Because the Plaintiffs' attorney "did not reference any legal principle or authority," Gulino felt
there was no need to consult the legal department.  (Doc. 34 at 21-22).  Hartford, however,
always has a duty to ensure its decisions are legally sound regardless of whether claimants
make legal arguments during the administrative review process.

capricious review.  Nor can the Court find that a claimant has the burden to inform a plan administrator as to what law is applicable during the claims review process.  Furthermore, Hartford gives no explanation as to why it is any less responsible for applying a federal common law presumption than any other portion of the federal common law or a statute that it is bound to operate under.

Hartford does not directly address the consequences of its failure to consider the applicable law in its decision making process, nor does Hartford address the inherent problem of inconsistent decisions that would almost always result from courts but not administrators applying the presumptions.  Hartford argues instead that its determination would not be arbitrary and capricious because sufficient evidence of suicide existed in the record to rebut the presumption.  The Court disagrees for several reasons.  First, the evidence in the record at the time of Hartford's decision was not conclusive of suicide, and it is likely that no reasonable factfinder could have found sufficient evidence of suicide to rebut the presumption based on the limited information available.  Second, Hartford's failure to consider the law it was bound to apply rendered its decision making process so fundamentally flawed that its decision was procedurally arbitrary and capricious regardless of its ultimate conclusion.

Apart from the legal presumption against suicide, Hartford argues that its decision was consistent with the federal common law in another respect.  Hartford states that its decision was consistent with the standard announced in *Wickman*, which disposed of the distinction between "accidental means" and "accidental results."  908 F.2d at 1077.  In *Wickman*, the evidence conclusively demonstrated that the decedent purposefully climbed over or through the guardrail on a ninety foot bridge.  *Id.* at 1080.

Whether he slipped off or intentionally jumped at that point was unclear, although he did state shortly before his death that he jumped. *Id.* The First Circuit rejected the plaintiff's argument that the death must be considered an accident unless the decedent possessed the specific intent to commit suicide. *Id.* at 1087. The court noted two potential difficulties with relying on the decedent's actual expectations: first, when those expectations are "patently unreasonable" and second, because they are "often difficult, if not impossible, to determine." *Id.* Therefore, the court held that if there is insufficient evidence to determine the decedent's subjective expectation or that expectation was known but patently unreasonable, then the administrator should use an objective standard to determine "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." *Id.* at 1088. If the decedent should have reasonably expected serious injury or death, then the injury or death is not accidental. *Id.* at 1089.[14]

Hartford suggests that an application of *Wickman* here would lead this Court to conclude, without regard to the suicide and intentionally self-inflicted injury exclusions, that Gwinette's death was not accidental "because it would be unreasonable for him to expect anything other than serious injury or death from shooting himself in the chest."[15] (Doc. 15 at 16). The Court finds *Wickman* inapposite to this case and Hartford's

---

[14] The Eleventh Circuit has approved of the use of *Wickman*'s test focusing on the objective expectations under the specific facts before the court in *Wickman* in determining whether a death was accidental. *Buce*, 247 F.3d at 1146-47. However, as discussed, the facts before this Court are not sufficient or conclusive enough to use the federal common law announced in *Wickman*.

[15] This argument is a close cousin to Hartford's argument that the presumption against suicide has no impact on its policy exclusion for intentionally self-inflicted injury. *See supra* section II.D.

reliance on *Wickman* suspect.  Unlike the administrative record in *Wickman*, which conclusively demonstrated to the court that the decedent intentionally jumped or purposefully engaged in conduct so reckless that he should have expected it would lead to his death, the record here does not conclusively show that Gwinette intentionally shot himself in the chest.  Hartford contends that even if the Plaintiffs provided evidence to support their theory that the gun jammed while Gwinette was cleaning it, *Wickman* would still apply because Gwinette should have known that "serious injury would be a probable outcome of continuing to handle" a gun known to jam.  (Doc. 15 at 16 n.5).  However, this argument also assumes that the record clearly demonstrates that Gwinette had knowledge that the gun was loaded while he was allegedly cleaning it.  This is not evident from the record.

Although the federal common law announced in *Wickman* may be appropriate to resolve an issue of intent when the insured's subjective intent is unknown or unreasonable, the standard is not appropriate to use in a case where the facts concerning whether the act in question was intentional are in dispute.  *See Schreck*, 104 F. Supp. 2d at 1376-77 (rejecting the application of *Wickman* to the facts where the court found the plan administrator's conclusion that exiting a moving vehicle was "highly likely to cause serious injury" to be arbitrary and capricious because the police and autopsy reports on which the plan administrator relied did not "provide sufficient evidence to support a finding that [the insured] intentionally left the car").  Because very little in the record suggests that Gwinette intentionally shot himself in the chest, Hartford's use of *Wickman* to exclude coverage is inappropriate and arbitrary and

capricious.  In sum, Hartford's failure to apply federal common law renders its decision to deny benefits arbitrary and capricious.

### 2.   Whether Hartford's Decision Was Based on Substantial Evidence

The Plaintiffs contend that Hartford's decision is arbitrary and capricious because Hartford did not base its decision on substantial evidence but instead relied on "generalizations and assumptions."  (Doc. 16-1 at 16).  Specifically, the Plaintiffs argue that Hartford inappropriately equated the remark "shot self" from the Autopsy Report with the intentional taking of one's own life.  Hartford replies that evidence from the official reports was substantial and conclusive enough to form the basis for its reasonable decision.

"The substantial evidence standard is merely 'a recitation of the arbitrary and capricious standard to factual findings;' it is 'more than a scintilla and is such evidence as a reasonable person would accept as adequate to support a conclusion.'"  *Nebesny-Fender v. Am. Airlines, Inc.*, 818 F. Supp. 2d 1319, 1332 (S.D. Fla. 2011) (quoting *Majali v. U.S. Dep't of Labor*, 294 Fed. Appx. 562, 563 n.1 (11th Cir. 2008)).  "An ERISA administrator cannot rely on unproven assumptions that are contradicted by the record, no matter how strongly it believes those assumptions to be true."  *Id.* (internal citation omitted).  "[T]he standard requires the [C]ourt to review 'the quality and quantity' of the evidence supporting [Hartford's] decision."  *Burnett v. AIG Life Ins. Co.*, 2011 WL 1226867, at *4 (E.D. Ky.).

Hartford cites *Racknor v. First Allmerica Financial Life Insurance Co.*, 71 F. Supp. 2d 723 (E.D. Mich. 1999), to show that a decision can be reasonable and based on substantial evidence even when the official reports submitted by experts are

conflicting.  In *Racknor*, the death certificate and autopsy report concluded that the manner of death was undetermined while the sheriff's department found the death to be a suicide after conducting a thorough investigation.  *Id.* at 725-27.  While the court did hold that the plan administrator's decision was not arbitrary and capricious, the court based its decision on the fact that the administrative record was "not internally inconsistent," and the administrator had "not overlooked any significant piece of evidence that would affect the decision, and Plaintiff [had] not pointed to any such evidence."  *Id.* at 729-30.  *Racknor* is inapplicable, however, because the Plaintiffs here pointed to several pieces of evidence, including the presence of gun-cleaning materials and a malfunctioning gun, that Hartford did not inquire into and, had it done so, that evidence would likely have impacted its decision.  Instead, Hartford seized on a few mentions of suicide in the Autopsy Report and Incident Report and ignored anything contradictory in the record.

While Hartford's myopic logic throughout the administrative process indicates that its decision was probably not reasonable on the merits or based on substantial evidence, the Court need not make a final determination on this ground because this case is being remanded for other reasons.

### 3.   Conflict of Interest

An insurance company that "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket" operates under a structural conflict of interest.  *Glenn*, 554 U.S. at 108.  The Court should consider the conflict as a factor in its arbitrary and capricious analysis, and "the significance of the factor will depend upon the circumstances of the particular case."  *Id.*; *Blankenship*, 644 F.3d at 1355.  The

conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision," but "[i]t should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Glenn*, 554 U.S. at 117.  Evidence of "procedural unreasonableness" would justify the Court in giving more weight to the conflict.  *Id.* at 118.

To establish that the structural conflict of interest here should have little weight as a factor in the Court's arbitrary and capricious analysis, Hartford submitted evidence of "its safeguards to separate the claim department from company finances and to ensure accurate decision-making." (Doc. 9-1 at 25).  Hartford does not use numerical quotas to require a certain number of claim approvals or denials and does not evaluate employees or provide any incentives based on the number of claims they approve or deny.  (Doc. 9-2 at ¶¶ 14-15, 23).  Hartford's appeal specialists do not discuss the merits of the claims they review with the analysts who made the initial benefits determinations.  (Doc. 9-2 at ¶ 18).  The claims department and the appeals unit are separated from the financial or underwriting departments.  (Doc. 9-2 at ¶ 19).

Hartford asserts that the Plaintiffs have offered no evidence to contradict its affidavit demonstrating Hartford's "unbiased" claims administration.  (Doc. 19 at 10). The Court disagrees.  The Plaintiffs have demonstrated that Hartford's claims denial was procedurally unreasonable because of failure to apply the federal common law presumptions and that it was most likely procedurally unreasonable for the reasons discussed below.  This sort of evidence supports weighing the conflict of interest more heavily against Hartford.  Accordingly, the Court finds that the structural conflict of

interest present here is a significant factor that contributed to Hartford's procedurally arbitrary and capricious denial of benefits.

### F.    Whether the Plaintiffs Received a Full and Fair Review

The Plaintiffs contend they were denied a full and fair review as required under ERISA because: (1) Hartford sent them a procedurally insufficient denial notice; (2) Hartford failed to consider the evidence submitted by the Plaintiffs or arbitrarily weighed such evidence; and (3) Hartford failed to adequately investigate the claim and to develop the evidence it had in its possession.[16]  Hartford denies the Plaintiffs' contentions that they were not afforded a full and fair review, stating that the Plaintiffs received ample opportunity to submit evidence to support their claim but they failed to do so.  Furthermore, Hartford contends that it conducted a thorough investigation and was entitled to use its discretion to weigh the information it had in whatever manner it deemed appropriate to reach its decision.

### 1.    The Denial Notice

The Plaintiffs contend Hartford's initial notice of denial was procedurally insufficient because "Hartford was vague as to the meaning of 'information,' failed to provide any indication as to the form required for [the] Plaintiffs' evidence to be given any weight, and failed to correct this error during subsequent communications."  (Doc. 20 at 4-5).

---

[16] The Plaintiffs argued Hartford's failure to conduct a full and fair review as a separate ground for finding Hartford's decision to be arbitrary and capricious.  Hartford rejected the merits of the Plaintiffs' argument but did not argue that errors of procedure under ERISA statutes or regulations are subject to a different standard of review.  As discussed above, the Court is analyzing the alleged procedural deficiencies apart from its arbitrary and capricious analysis.

ERISA requires that any participant in an employee benefit plan whose claim has been denied receive adequate notice explaining the denial and a full and fair review by the fiduciary who denied the claim. 29 U.S.C. § 1133. The claims procedure regulations under ERISA require that a notification of any adverse benefit determination include, "in a manner calculated to be understood by the claimant":

> (i) The specific reason or reasons for the adverse determination;

> (ii) Reference to the specific plan provisions on which the determination is based;

> (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

> (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review ….

29 C.F.R. § 2560.503-1(g)(1). The initial claim denial letter directed the Plaintiffs to submit "additional information, not previously submitted, which you believe will assist us in evaluating your claim" and, "[i]n particular, any information which indicates that the insured's death was not caused or contributed to by any intentionally self-inflicted injury." (Doc. 9-5 at 27). No request for additional information or clarification as to what form the information must be submitted was sent to the Plaintiffs before denial of their appeal.

The Eleventh Circuit requires substantial rather than strict compliance with ERISA's notice provisions. *Bojorquez v. E.F. Johnson Co.*, 315 F. Supp. 2d 1368, 1373 (S.D. Fla. 2004) (citing *Counts v. Am. Gen. Life & Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997)). "The proper inquiry in determining substantial compliance is whether

the notice provided enough information for [the Plaintiffs] to understand [Hartford's] position such that any appeal would be effective." *DeLorenzo v. Hartford Life & Accident Ins. Co.*, 2006 WL 485119, at *9 (M.D. Fla.) (internal citations omitted).  The requirement to advise a claimant of what additional material or information is necessary to "perfect a claim" is not synonymous with "with the appeal" but more likely means to advise a claimant on how to submit a "complete claim."  *Terry v. Bayer Corp.*, 145 F.3d 28, 39 n.8 (1st Cir. 1998).

Hartford's April 6, 2010, denial letter does state a specific reason for an adverse determination (i.e., "an intentionally self-inflicted gunshot wound to [Gwinette's] chest") and substantiates its reason with information from the Death Certificate, the Autopsy Report, and the Incident Report.  (Doc. 9-5 at 27).  The letter cites the specific exclusions in the policies for denying coverage and advises the Plaintiffs of the plan's review procedures and their right to bring a civil action under Section 502(a) of ERISA. While the denial letter appears to comply with three out of the four notice provisions, the Court has serious concerns with whether Hartford satisfactorily advised the Plaintiffs of what information was necessary to "perfect the claim" and whether this potential defect was so egregious that the denial letter did not substantially comply with ERISA's notice provisions.

Hartford's claim analysts use Investigation Guidelines tailored to specific types of AD&D claims that suggest what issues and facts should be considered in the decision making process.  Part of the guidelines specifically address gunshot wound claims and suggests fourteen items for the claim analyst to take into consideration:[17]

---

[17] Hartford filed this and other information under seal pursuant to a Stipulated Confidentiality Agreement and Protective Order.  (Doc. 29).  Clearly, however, Hartford's instructions regarding

(1) obtain medical reports (with an "emphasis on bullet path and powder
burns"); (2) get a complete description of the gun ("including make, type,
caliber, serial number, and condition"); (3) determine ownership of the
gun; (4) determine whether the insured was experienced in the use of
guns; (5) look for any evidence that the insured was cleaning the gun; (6)
determine whether the safety catch was on; (7) determine how many
bullets were in the gun and how many shots were fired; (8) determine
whether there was a good reason for using a gun at the time of death; (9)
determine whether the position of the body was such that the insured
could have discharged the gun; (10) look for any indication of suicide at
the scene; (11) determine whether there was a suicide note; (12) look for
a motive of suicide ("check into the physical and mental health, financial,
moral, and domestic situations of the insured"); (13) interview anyone who
last saw the insured alive to determine their impressions about the
insured's mental and physical health or other possible motives for suicide
and determine whether there were any previous attempts; and (14) look
for any evidence of beneficiary involvement.

Given this clear statement of the evidence Hartford finds important in determining
whether an insured who died of a gunshot wound committed suicide, the Court

---

the type of factual information that should be submitted and considered in a gunshot death claim
is not information that should be kept from claimants.  Indeed, it is clear to the Court that
Hartford should make known to plan participants the type information that would be helpful in
the resolution of claims.  Accordingly, the Court modifies the Stipulated Confidentiality
Agreement and Protective Order (Doc. 29) to provide for the disclosure of the information
discussed in this Order.

questions whether a direction to the Plaintiffs to supplement their claim with "any information" they believed important in establishing that Gwinette's death was not an "intentionally self-inflicted injury" was sufficient.[18]  Because the Plaintiffs have never contested that Gwinette suffered an injury that was not self-inflicted, the only guidance they received from Hartford was to negate intent, but they were never told what form the "information" needed to take in order to be considered "evidence" by Hartford.  While Hartford was not required to "spell out in intricate detail the specific items" of evidence necessary for the Plaintiffs' claim to be approved, the denial notice did need to sufficiently place them "on notice of what evidence would be needed."  *See Ecklund*, 415 F. Supp. 2d at 1376.[19]  Furthermore, Hartford was on notice of information (i.e., the presence of gun cleaning materials and scene photographs) that Hartford could have specifically requested from the Plaintiffs in a form that would have been more satisfactory to Hartford.

### 2.    Failure to Consider Evidence and Arbitrarily Weighing Evidence

---

[18] The Court also questions Hartford's cavalier dismissal of the information submitted by the Plaintiffs regarding the absence of suicidal intent, the absence of any motive to commit suicide, the condition of the gun, Gwinette's lack of experience with guns, and perhaps most significantly, the information suggesting that Gwinette was cleaning the gun.

[19] Other courts evaluating whether denial letters substantially complied with ERISA's notice provision generally find sufficient notice of what information is necessary to perfect a claim as long as the administrator told the claimant what "type" information to submit.  *See Melech*, 2012 WL 4210506, at *12 (claimant received sufficient notice when she was told what "type of medical information" she could submit to show she was disabled); *Schreiner v. United Wisconsin Ins. Co.*, 626 F. Supp. 2d 892, 906-07 (W.D. Wis. 2009) (finding sufficient notice when the administrator suggested that the claimant provide medical records, results of diagnostic testing, etc … to support her claim of disability); *cf. Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 691 (7th Cir. 1992) (stating that "a blanket request for 'additional medical information'" without specifying what kind of information is needed does not satisfy the regulatory requirements).

The Plaintiffs also argue that Hartford deprived them of a fair chance to present their case because it employed a "hidden standard for information it would consider" and failed to provide notice of the form in which information needed to be submitted to be worthy of consideration by Hartford.  (Doc. 20 at 6).  Therefore, the Plaintiffs contend, Hartford never truly considered their evidence during the administrative process.  Hartford maintains that the Plaintiffs never submitted any "evidence," and it is "perplexing" that the Plaintiffs believed that "Hartford should disregard official reports in favor of an unsubstantiated attorney advocate letter."  (Doc. 19 at 2).  Moreover, Hartford points out that the "Proof of Loss" provision in the policies states "[a]ll proof submitted must be satisfactory to [Hartford]," allowing it to credit evidence in whatever manner it deemed appropriate without rendering its decision arbitrary.  (Doc. 9-3 at 56).

ERISA provides claimants with the right to an appeal that "takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."  29 C.F.R. § 2560.503-1(h)(2)(iv).  Although a plan administrator must take all information into account during the appeal process, the administrator still has discretion to weigh certain records more heavily than others.  *Capone*, 592 F.3d at 1200; *see also Brown v. Blue Cross & Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1572 (11th Cir. 1990), *overruled on other grounds by Doyle*, 542 F.3d at 1360 ("Even a self-interested fiduciary is entitled to choose an apparently more reliable source of information when sources conflict.").  However, this discretion is not unfettered.  *See Burnett*, 2011 WL 1226867, at *12 (internal citation omitted) ("When a

plan fiduciary relies on inconclusive, unreliable evidence, and ignores contrary evidence, the resulting decision is arbitrary and capricious.").

There are several indications in the record that Hartford arbitrarily weighed the evidence available to it.  While the information found in the Incident Report does not suggest that it was unreliable, that information does indicate that the report was not as conclusive as Hartford made it out to be.  In the face of a Death Certificate that lists the manner of death as undetermined and an Autopsy Report that states the death was a suicide, "it simply does not suffice for [Hartford] to attribute to [Deputy Salter] opinions he did not express in the record as a counterweight" to the Death Certificate.  *Id.* at *13. "If the other opinions expressed in the record overwhelmingly pointed to suicide, the inferential leap might not appear so great."  *Id.*  But here, there were multiple references in the record to an accidental death.  Furthermore, Hartford steadfastly maintains that the Plaintiffs' "suggestions were not corroborated by the physical evidence contained in the police and autopsy reports" and "the contentions in the [Plaintiffs'] attorney's letter were insufficient to dispute the actual findings of the medical examiner."  (Doc. 34 at 15).  Notably, the information provided by the Plaintiffs was never refuted in any of the official reports relied on by Hartford either.  In fact, apart from the Plaintiffs' statement that no clip was found in the gun and that cleaning materials were present at the scene, the information submitted by the Plaintiffs is not necessarily the type of information that would have been considered or included in an autopsy report, a responding officer's brief incident report, or a death certificate.

Although Hartford argues that it did give consideration to the Plaintiffs' information submitted on appeal, Hartford merely recited the information from the

Plaintiffs' appeal letter in its letter denying that appeal and has since maintained that the Plaintiffs' information was not "evidence" that could be afforded any weight in the review process.  Also in that denial letter, Hartford concluded its summary of the information in the administrative record with the statement: "we must rely upon the facts brought forth by the experts, the documentation they submitted, and the policy provisions and guidelines."  (Doc. 9-5 at 3).  This statement further highlights how little consideration, if any, the Plaintiffs' information received during the review process.  To the extent this statement implies that Hartford was only willing to consider documentation submitted by "experts" (such as scene photographs, a full investigation report from Lieutenant Cochran, or gun testing), Hartford should have told the Plaintiffs this in the initial denial letter to give the Plaintiffs a better chance at a full and fair review.  *See Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 637 (9th Cir. 2009) (stating that if Hartford knew or believed other information existed that would have better substantiated the plaintiff's claim, then telling the plaintiff in the appeal denial letter that Hartford had to rely on the "weight of the evidence" in the file "came too late").  While Hartford's policies do state that all proof submitted must be satisfactory to Hartford, the policies nowhere define what form proof must take to be given consideration.

### 3.    Failure to Conduct a Proper Investigation

Finally, the Plaintiffs contend that they were denied a full and fair review because Hartford failed to conduct an adequate investigation by declining to contact any of Gwinette's family, friends, or co-workers to determine Gwinette's recent mental state, ignoring the alleged mechanical issues with the gun, and not following up on additional circumstances that were not included in the initial Incident Report as pointed out by the

Plaintiffs.  Hartford asserts, again, that it "obtained all of the relevant investigative reports" and "could not reasonably be expected to go behind these officials and discover additional evidence after the fact."  (Doc. 15 at 19).

A plan administrator's benefit determination is a fiduciary act.  *Glenn*, 554 U.S. at 111 (citing *Firestone*, 489 U.S. at 111-13).  As a fiduciary, a plan administrator owes plan participants and beneficiaries a duty of loyalty requiring it to discharge it duties solely in their interest.  29 U.S.C. § 1104(a)(1).  A plan administrator also owes plan participants and beneficiaries a duty of care to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  A plan administrator "has a duty to investigate matters essential to the denial of the insured's claim."  *Schreck*, 104 F. Supp. 2d at 1377 (internal citation omitted).  A "failure to investigate or to interpret honestly evidence that greatly preponderates in one direction" is a sufficient basis for finding a plan administrator's decision to be arbitrary and capricious.  *See Brown*, 898 F.2d at 1566 n.11, *overruled on other grounds by Doyle*, 542 F.3d at 1360.

As discussed above, Hartford's "Investigation Guidelines" provide its claim analysts with guidance on important factors to consider when evaluating claims where the insured died of a gunshot wound.  Hartford argues that the guidelines "do not establish legally binding requirements with respect to claim adjudication" but instead should be reviewed for substantial compliance in the same manner as compliance with ERISA regulations.  (Doc. 34 at 17).  Hartford concludes that its review process substantially complied with its internal procedures, showing that its decision was

ultimately reasonable.  Although the "guidelines do not have the force of law,"[20] the

Court questions whether Hartford substantially complied with its own guidelines.

Hartford did obtain medical reports but heavily relied on any reference to a

"contact-range self-inflicted gunshot wound" contained in them.  Although Hartford had

information that the gun was used and owned by Gwinette, it never inquired into the

Plaintiffs' statements that the gun was known to malfunction or that Gwinette was

inexperienced in its use.  Gulino stated: "It was not necessary to seek additional

information regarding the description and ownership of the gun or [Gwinette's]

experience with guns because the documentation from the authorities that investigated

the manner of death was not questionable."  Hartford was told twice (i.e., in the initial

claim form and in the appeal letter) that Gwinette was cleaning a gun but did not inquire

into the matter because there was no evidence that Gwinette was cleaning his gun in

Deputy Salter's report, and there was no mention of possible gun cleaning in the

Autopsy Report even though the AME reviewed scene photographs.[21]  Despite its

knowledge of the existence of the photographs, Hartford never attempted to obtain the

photographs for its own review.  Hartford did not inquire into whether the safety catch

was on or how many bullets were in the gun, even though the Plaintiffs claimed that the

gun did not have a clip in it.  Hartford never looked into whether Gwinette possessed a

motive or the intent to commit suicide during its initial review or even after the Plaintiffs

tried to establish that Gwinette lacked the intent on appeal.  Nor did Hartford bother to

---

[20] *Karamshahi v. Ne. Utils. Serv. Co.*, 41 F. Supp. 2d 101, 105 (D. Mass. 1999).

[21] Although the Autopsy Report states that "[s]cene photographs were reviewed," the AME never described how many photographs were reviewed or what their contents were.  (Doc. 9-5 at 43).

interview anyone who last saw Gwinette alive or determine whether Gwinette had previously attempted suicide.  Despite the record's poorly developed facts, Hartford never conducted an investigation on initial review or appeal apart from its review of the Death Certificate, the Autopsy Report, and Incident Report.

Ultimately, the Court need not conclude whether the Plaintiffs initially received a full and fair review as required under ERISA because the case is being remanded and the administrative record reopened as discussed below.[22]

**G.    Remedy**

"As a general matter a court should not resolve the eligibility question on the basis of evidence never presented to [an ERISA plan's administrator] but should remand to the [administrator] for a new determination."  *Jett*, 890 F.2d at 1140 (internal quotations and citations omitted); *see also Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006) (quoting *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005)) ("[W]here the 'problem is with the integrity of [the plan's] decision-making process,' rather than 'that [a claimant] was denied benefits to which he was clearly entitled,' the appropriate remedy generally is remand to the plan administrator.").  "A court's decision whether to remand a case to an administrator under ERISA is discretionary."  *Johnson v. Hartford Life & Accident Ins. Co.*, 2008 WL 8869743, at *2 (N.D. Ala.) (citing *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1328 (11th Cir. 2001)).  Accordingly, the Court finds that remand to Hartford is the most appropriate remedy because of procedural problems during Hartford's prior review.  On

---

[22] Even if conclusive procedural violations do exist, they do not establish the right to a substantive remedy without a showing of entitlement to benefits under the plan. *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 239 (4th Cir. 2008).  The appropriate remedy for procedural violations is remand to the plan administrator for a full and fair review.  *Id.*

remand, the Plaintiffs can supplement the administrative record even if the additional evidence is subsequently obtained.  *Schreck*, 104 F. Supp. 2d at 1378 (citing *Shannon v. Jack Eckerd Corp.*, 113 F.3d 208, 210 (11th Cir. 1997); *Jett*, 890 F.2d at 1140).

## III. CONCLUSION

For the foregoing reasons, the case is **REMANDED** to Hartford for reconsideration of the Plaintiffs' claims for AD&D benefits.  Accordingly, the Plaintiffs' Motion for Summary Judgment (Doc. 10) is **GRANTED** in part and **DENIED** in part, and Hartford's Motion for Judgment as a Matter of Law is **DENIED**.  On remand, Hartford should conduct a good faith, *de novo* review which takes into account the federal common law presumptions against suicide and in favor of accident and should consider all information, documentation, comments, and records that the Plaintiffs submit into the reopened record.  This action is **STAYED** pending completion of the administrative review and further Order of the Court.  The Parties shall file a joint status report every **30 days** from the entry of this Order.

**SO ORDERED**, this the 10th day of January, 2013.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT